## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

BARBARA HUNT,

              Plaintiff,

v.

              CASE NO. 2:20-cv-00470-FtM-66NPM

ETHICON INC.,
JOHNSON & JOHNSON,

              Defendants.

## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff, Barbara Hunt ("Plaintiff"), by and through her attorneys of record, and, for her cause of action against Defendants Ethicon, Inc. and Johnson & Johnson (collectively "Defendants"), states and alleges as follows:

## PARTIES

1.      Plaintiff is a citizen of the United States of America and a resident of Florida.

2.      Upon information and belief, Defendant Johnson & Johnson ("Johnson & Johnson") is a New Jersey Corporation.

3.      Upon information and belief, Defendant Ethicon, Inc. is a New Jersey Corporation. Ethicon, Inc. is a subsidiary of Johnson & Johnson.

4.      All acts and omissions of Defendants, as described herein, were done by their agents, servants, employees, and/or owners acting in the course and scope of their respective agencies, services, employments, and/or ownership.

1

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs, and complete diversity of citizenship exists between Plaintiff and Defendants.

6.      Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, because Plaintiff was implanted with and subsequently injured by Defendants' TVT-Secur product (referred to hereinafter as "TVT-S" or "the Product") in Fort Myers, Lee County, Florida.

### COMMON FACTS

### A. Stress Urinary Incontinence

7.      Defendants promote their pelvic mesh products as devices intended to treat stress urinary incontinence ("SUI") and/or pelvic organ prolapse ("POP").

8.      SUI is the involuntary loss of urine during movement that puts pressure on the bladder, such as laughing, coughing, sneezing, or aerobic or strenuous exercise.  Although incontinence is suffered by both men and women, it is more common in women and can be caused by menopause or by physical changes that occur in the body during pregnancy or childbirth.

9.      SUI is, in many cases, treatable. A woman who elects to have SUI surgically treated has several options. SUI, for example, can be corrected through abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure"). SUI also can be surgically addressed using synthetic materials such as suprapubic mid-urethral "slings" placed under the urethra to provide support.

10.     Surgical mesh products have been used to repair abdominal hernias since the 1950s. In the 1970s, gynecologists began using surgical mesh products that were designed for abdominal

hernia repair to surgically repair POP.  In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of SUI.

11.     Manufacturers (such as Defendants) also began to modify the mesh used in hernia repair to be used as "pelvic mesh products" specifically intended to correct SUI. Today, Defendants manufacture and sell pelvic mesh products, as well as pelvic mesh "kits," which can include the surgical mesh and also tissue fixation anchors and insertion tools.

12.     The pelvic mesh products manufactured by Defendants are considered Class II medical devices.

13.     Unlike Class III medical devices, such as an artificial heart or an Automated External Defibrillator, Class II devices do not require "approval" by the Food and Drug Administration ("FDA"). Whereas Class III devices cannot be sold until the manufacturer demonstrates to the FDA, through adequate and well-controlled clinical trials, that the proposed device is safe and effective, there is no such requirement for Class II devices.

14.     Under the FDA's "Substantial Equivalence" process under Section 510(k) of the Food, Drug and Cosmetic Act, a manufacturer must provide a premarket notification that allows the FDA to determine whether a medical device is substantially equivalent to a "predicate device." A predicate device is one that the FDA has placed into one of three categories and "cleared" for marketing.

15.     The "premarket notification" process -- for Class II devices -- is not focused on whether the device is safe and effective, but rather is concerned with whether the proposed device is substantially equivalent to an existing predicate device that was already cleared for marketing by the FDA.

3

16.     At all times material to this action, Defendants designed, tested, patented, manufactured, packaged, labeled, marketed, sold, and distributed a line of pelvic mesh products intended to treat SUI. Each of these products was cleared for sale in the United States after the Defendants made assertions to the FDA of "Substantial Equivalence" under Section 510(k). This clearance process does not require the applicant to prove safety or efficacy.

17.     One of the pelvic mesh products that Defendants designed, tested, patented, manufactured, packaged, labeled, promoted, marketed, sold, and distributed was the TVT-S, which was intended to treat SUI.

18.     Defendants were aware, or should have been aware, of the dangers inherent in the TVT-S, notwithstanding the fact that the Product was "cleared" for sale by the FDA.

19.     On October 21, 2008, the FDA issued a Public Health Notification that described over 1,000 complaints that had been reported over a three-year period related to pelvic mesh products.

20.     In June 2012, Defendants notified the FDA of their intention to discontinue the sale of the TVT-S, beginning in 2013.  The Product has not been available on the market since that time.

21.     Due to defects in design, manufacture and warnings, the TVT-S implanted into the Plaintiff was unreasonably dangerous at the time that it left Defendants' control.

### B. Plaintiff's Medical History and Experience

22.     On July 16, 2008, at Lee Memorial Health System in Fort Myers, Florida, Plaintiff was implanted with a TVT-S that was designed, manufactured, packaged, labeled and sold by Defendants.

4

23.     This TVT-S was implanted in Plaintiff with the intention of treating her SUI, a use for which Defendants marketed and sold this product.

24.     Plaintiff's surgery was performed without intraoperative complications.

25.     At all times, the TVT-S that was implanted in Plaintiff was being used for the purpose that Defendants marketed the product.

26.     After, and as a result of implantation, Plaintiff suffered serious bodily injuries, including extreme pain, mesh erosion, and other injuries similar to the ones described in the FDA's Public Health Advisory of October 21, 2008.

27.     These injuries would not have occurred but for the defective nature of the Product implanted and/or Defendants' wrongful conduct.

28.     As a result of having the TVT-S implanted, Plaintiff has suffered and continues to suffer multiple severe and painful personal injuries, including painful surgical intervention to address and excise some or all of the Product; on December 6, 2016 at Gladiolus Surgery Center in Fort Myers, Florida and on March 14, 2019 at Tampa General Hospital in Tampa, Florida. Plaintiff has had to undergo additional surgeries and interventions as a result of the Product and to address injuries and problems caused by the same, which include, but are not limited to, surgeries and interventions performed in Tampa, Florida on May 2, 2019, August 23, 2019, July 24, 2020, July 27, 2020 and August 26, 2020, respectively.  Further, the Plaintiff likely will require continuing and future medical care and treatment, including corrective surgery or surgeries.  She has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses and likely will continue to incur such expenses in the future.

## COUNT I: NEGLIGENCE

29.     At all times material hereto, Defendants had a duty to Plaintiff and to other foreseeable users of the Product, to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, labeling, assembling, packaging, distribution, detailing, promotion and sale of the Product.

30.     Defendants had a further duty to provide adequate and sufficient instructions concerning the proper use of the Product, as well as warnings of the risks and dangers associated with using the Product, to Plaintiff and to other foreseeable users of the Product.

31.     Defendants breached their duties to Plaintiff when they failed to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, labeling, assembling, packaging, distribution, detailing, promotion and sale of their Product so as to avoid unreasonable risk of harm to women in whom the Product was implanted, including Plaintiff.

32.     Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Product.

33.     The Product implanted in Plaintiff was unreasonably dangerous and defective for reasons that include, but are not limited to, the following:

a)     The use of polypropylene material in the Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b)     The design of the Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c)     Biomechanical issues with the design of the Product, including, but not limited to, the propensity of the Product to contract or shrink inside the body that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d)      The propensity of the Product to "creep" or to gradually elongate and deform when subject to prolonged tension inside the body;

e)      The inelasticity of the Product, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

f)      The propensity of the Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction and results in continuing injury over time;

g)      The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturer's instructions;

h)      The Product degrade over time, causes chronic foreign body reactions, fibrotic bridging, mesh contracture/shrinkage, fraying, deformation, roping, rolling and curling of the mesh;

i)      Adequate studies to establish safety and effectiveness for permanent human implantation to treat SUI are lacking;

j)      The Instructions For Use ("IFU") that Defendants provided with all Mesh Product do not fully disclose or adequately warn about the Product's known or knowable risks, adverse reactions, and characteristics;

k)      The use of polypropylene material in the Product and the failure to provide adequate IFU and training;

l)      Defendants failed to design and establish a safe, effective procedure for removal of their Product; therefore, in the event of a failure, injury, or complication, they are impossible to easily and safely remove;

m)      Defendants used non-medical grade material to make their Product; and

n)      The pore size and stiffness of the Product were unsafe and resulted in unnecessary

complications to women and created an unacceptable risk of chronic pain and the mesh ripping through vaginal tissue.

34.     Defendants also breached their duty to adequately and sufficiently warn Plaintiff and her healthcare providers and other foreseeable users of the Product's propensity to erode, the rate and manner of mesh erosion, the risk of chronic infections resulting from implantation of the Product, the risk of vaginal scarring as a result of implantation of the Product, the risk of recurrent severe pelvic pain and other pain resulting from the implantation of the Product, the need for corrective or revisionary surgery to adjust or repair the Product, or the overall severity of complications that could arise as a result of implantation of the Product.

35.     Defendants' Product incorporates a monofilament polypropylene mesh unintended for the treatment of SUI. Despite claims that this material is inert, the emerging scientific evidence suggests that this material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving Defendants' Product containing this material. This immune response promotes degradation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh. Moreover, the mesh migrates within the surrounding tissues causing irreparable damage to the tissue including nerve endings residing within the tissues. Damaged nerve endings do not regenerate and lead to debilitating neuromas suffered by patients such as Plaintiff.

36.     Defendants made claims and representations in documents submitted to the FDA, in reports to the public and to healthcare professionals, and in advertisements that the Product did not present serious health risks.

37.     These and other representations made by Defendants were false when made and/or were made with the pretense of actual knowledge, when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

38.     These and other representations made by Defendants were made with the intention of deceiving Plaintiff, Plaintiff's healthcare professionals, and other members of the healthcare community and were made in order to induce Plaintiff and her healthcare professionals to rely on misrepresentations and caused Plaintiff to purchase, rely, use, and request the Product and her healthcare professionals to dispense, recommend, or prescribe the Product.

39.     Defendants' Product has been and continues to be marketed to the medical community and to patients as safe, effective, reliable, medical devices implanted by safe and effective minimally invasive surgical techniques for the treatment of medical conditions, primarily SUI, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing pelvic mesh products.

40.     The Defendants have marketed and sold the Product to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to health care providers at medical conferences, hospitals, and private offices and include the provision of valuable cash and non-cash benefits to health care providers. Also utilized are documents, brochures, and websites offering exaggerated and misleading expectations as to the safety and utility of the Product.

41.     Contrary to the Defendants' representations and marketing to the medical community and to the patients themselves, the Defendants' Product has high failure, injury, and complication rates, fails to perform as intended, requires frequent and often debilitating re-operations, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making it defective under the law. The Defendants consistently have underreported and withheld information about the propensity of the Product to

fail and cause injury and complications, have misrepresented the efficacy and safety of the Product, and, through various means and media, have actively and intentionally been misleading the FDA, the medical community, patients, and the public at large.

42.    Defendants knew and had reason to know that the Product could and would cause severe and grievous personal injury to users and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

43.    Defendants knew or had reason to know that Plaintiff and her physicians and other healthcare providers had no way to determine the truth behind Defendants' concealment and omissions and that these included material omissions of facts surrounding the use of the Product, as described in detail above.

44.    In reliance upon these false representations, Plaintiff was induced to and did use the Product, thereby sustaining severe and permanent personal injuries and damages.

45.    Had Plaintiff or her treating physician known of the unreasonably dangerous risks associated with the Product at the time of her implant surgery, such knowledge would have affected the treating physician's use of the Product, and Plaintiff would not have consented to the implantation of the device.

46.    As a direct and proximate result of Defendants' breaches of duty, as described above, Plaintiff has suffered serious and permanent physical and mental injuries. Additionally, Plaintiff has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

47.    As a direct, proximate, and foreseeable result of Defendants' negligence, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT II:  STRICT LIABILITY – DESIGN DEFECT

48.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

49.    The Product implanted in Plaintiff was not merchantable and reasonably safe for its intended uses and was defective as described herein with respect to its design. The Product's design defects include, but are not limited to:

a)    The use of polypropylene material in the Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b)    The design of the Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh, causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c)    Biomechanical issues with the design of the Product, including, but not limited to, the propensity of the Product to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d)    The use and design of arms and anchors in the Product, which, when placed in women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e)    The propensity of the Product to "creep" or to gradually elongate and deform when subject to prolonged tension inside the body;

f)    The inelasticity of the Product, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

g)    The propensity of the Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction and results in continuing injury over time;

h)    The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturer's instructions;

i)    The use of polypropylene material in the Product and the failure to provide adequate IFU and training;

j)      Defendants used non-medical grade material and counterfeit material illegally smuggled in from China to make their medical devices; and

k)      The pore size and stiffness of the device was unsafe and resulted in unnecessary complications to women and created an unacceptable risk of chronic pain and the mesh ripping through vaginal tissue.

50.     As a result of the design defects set forth herein, the risk of harm in the Product's design outweighed the utility of the design.

51.     Feasible, suitable and safer alternative designs, as well as feasible, suitable and safer alternative procedures and instruments for implantation, have existed at all times relevant as compared to the pelvic mesh products.  These feasible, suitable and safer alternative designs and procedures would have prevented or minimized Plaintiff's injuries.

52.     The Product implanted into Plaintiff was in the same or substantially similar condition as it was when it left the possession of Defendants and in the condition directed by and expected by the Defendants.

53.     Plaintiff and her physicians foreseeably used and implanted the Product and did not misuse or alter the Product in an unforeseeable manner.

54.     The medical and scientific literature studying the effects of polypropylene pelvic mesh, like Defendants' pelvic mesh products, have examined injuries, conditions, and complications, such as those suffered by Plaintiff, and determined that they are, in fact, causally related to the mesh itself and do not often implicate errors related to the implantation of the devices.

55.     As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff has suffered serious and permanent physical and mental injuries and pain and suffering; has undergone medical treatment and likely will undergo further medical

treatment and procedures; and has suffered financial and economic loss, including, but not limited to, medical expenses, and other damages.

56.     Defendants are strictly liable to Plaintiff for designing, marketing, labeling, packaging, and selling the defective Product.

## COUNT III:  STRICT LIABILITY – FAILURE TO WARN

57.     All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

58.     Defendants had a duty to give an adequate warning of known or reasonably foreseeable dangers, risks and complications arising from the use of the Product.  Defendants owed this duty to warn to all persons whom Defendants should have reasonably foreseen may use or be affected by the product, including, but not limited to, Plaintiff, Plaintiff's healthcare providers, and the FDA.

59.     Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, Plaintiff, Plaintiff's healthcare providers, and the FDA.

60.     The Product implanted in Plaintiff was not reasonably safe for its intended uses and was defective as described herein as a matter of law due to its lack of adequate, appropriate and necessary warnings. Specifically, Defendants did not provide sufficient or adequate warnings regarding, among other subjects:

a)     The Product's propensities to contract, retract, and/or shrink inside the body;

b)     The Product's propensities for degradation, fragmentation, disintegration and/or creep;

c)     The Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

13

d)      The rate and manner of mesh erosion or extrusion;

e)      The risk of chronic inflammation resulting from the Product;

f)      The risk of chronic infections resulting from the Product;

g)      The risk of permanent vaginal or pelvic scarring as a result of the Product;

h)      The risk of recurrent, intractable pelvic pain and other pain resulting from the Product;

i)      The need for corrective or revision surgery to adjust or remove the Product;

j)      The severity of complications that could arise as a result of implantation of the Product;

k)      Treatment of SUI with the Product is no more effective than feasible available alternatives;

l)      Treatment of SUI with the Product exposes patients to greater risk than feasible available alternatives;

m)      Treatment of SUI with the Product makes future surgical repair more difficult than feasible available alternatives;

n)      Use of the Product puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

o)      Removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life;

p)      Complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain;

q)      The nature, magnitude, and frequency of complications that could arise as a result of implantation of the Product; and

r)      The material was never intended to be used in a medical device permanently implanted in the body and the material was non-medical grade.

61.      Defendant acted unreasonably in failing to undertake its duties to properly know the qualities of its products and, in representations to Plaintiff and/or to Plaintiff's healthcare providers, concealed and intentionally omitted the following material information:

14

a)      That the Product was not as safe as other products and procedures available to treat incontinence and/or prolapse;

b)      That the risk of adverse events with the Product was higher than with other products and procedures available to treat incontinence and/or prolapse;

c)      That the risk of adverse events with the Product was known by Defendants and was not adequately tested;

d)      That the limited clinical testing revealed the Product had a higher risk of adverse effects in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

e)      That Defendants failed to follow up on the adverse results from clinical studies and buried and/or misrepresented those findings;

f)      That Defendants were aware of dangers in its pelvic mesh products, including the pelvic mesh systems, in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

g)      That the pelvic mesh systems were dangerous and caused adverse side effects, including, but not limited to, higher incidence of erosion and failure at a much more significant rate than other products and procedures available to treat incontinence and/or prolapse;

h)      That patients frequently would need revisionary surgery due to changes in the structure of the Product that would cause it to be become loose or shift position within the body;

i)      That patients needed to be monitored more regularly than usual while using the Product and, in the event the Product needed to be removed, that the procedure to remove the Product had a very high failure rate and/or needed to be performed repeatedly;

j)      That material Defendants were using carried a specific safety warning to never be used as a permanent implant in the human body;

k)      That Defendants rushed the Product to market against the concerns of consultants and employees;

l)      That Defendants were aware of safety issues with design of the Product and the pain it caused to patients;

m)      That Defendants were aware the Product was not as safe or efficacious as other alternatives;

n)     That Defendants' internal risk assessments concluded there was lack of data to support the safety and efficacy of the Product; and

o)     That Defendants received complaints about the design of the Product, including from their own consultants, only to conceal them and not make changes to the design.

62.     Defendants were under a duty to disclose to Plaintiff and her physicians the defective nature of the Product, including, but not limited to, the heightened risks of erosion, failure, and permanent injury.

63.     Defendants misrepresented to the medical and healthcare community, Plaintiff, the FDA, and the public at large that the Product had been tested and was found to be safe and effective for the purposes of treating SUI.

64.     These representations were made by Defendants with the intent of inducing Plaintiff, the medical community, and the public to recommend, prescribe, dispense, and purchase the Product for use as a means of treatment for SUI, all of which evinced an indifference to the health, safety, and welfare of Plaintiff.

65.     Defendants had sole access to material facts concerning the defective nature of the Product and its propensity to cause serious and dangerous side effects and, hence, cause dangerous injuries and damage to women who used the Product, including Plaintiff.

66.     At the time these representations were made by Defendants and at the time Plaintiff used the Product, she and her implanting surgeon were unaware of the falsehood of these representations, and reasonably believed them to be true.

67.     Defendants' concealment and omissions of material facts concerning the safety of its pelvic mesh products were made to cause Plaintiff's physicians and healthcare providers to purchase, prescribe, and/or dispense the Product and/or to mislead Plaintiff into reliance and cause Plaintiff to use the Product.

16

68.     Defendants provided incomplete, insufficient, and misleading training and information to physicians in order to increase the number of physicians utilizing the pelvic mesh products and, thus, increase the sales of the pelvic mesh products, leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

69.     Defendant intentionally made material misrepresentations to the medical community and public, including Plaintiff, regarding the safety of the Product, specifically that it did not have dangerous and/or serious adverse health safety concerns and that it was as safe as other means of treating SUI.

70.     Defendant intentionally failed to inform the public, including Plaintiff and her implanting surgeon, of the high failure rate, erosion, the difficulty of removing the Product, and the risk of permanent injury.

71.     Instead, Defendants chose to over-promote the safety, efficacy, and benefits of the Product.

72.     Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Product, she would not have purchased, used, consented to, or relied on the Product.

73.     As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff has suffered serious and permanent physical and mental injuries and pain and suffering; has undergone medical treatment and likely will undergo further medical treatment and procedures; and has suffered financial and economic loss, including, but not limited to, medical expenses, and other damages.

74.     Defendants are strictly liable to Plaintiff for their failure to provide adequate and sufficient warnings to Plaintiff and to foreseeable users of the defective Product.

## COUNT IV: COMMON LAW FRAUD

75.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

76.    Defendants falsely and fraudulently represented and continue to represent to the medical and healthcare community, Plaintiff, and the public that the Product has been tested and found to be safe and effective. The representations made by Defendants were, in fact, false.

77.    Defendants knew or had reason to know that their representations were false, and Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in their representations and the dangers and health risks to users of the Product implanted in Plaintiff.

78.    In representations to Plaintiff and/or her healthcare providers, Defendant fraudulently concealed and intentionally or recklessly omitted the following material information:

a)    That the Product was not as safe as other products and procedures available to treat incontinence;

b)    That the risk of adverse events with the Product was higher than with other products and procedures available to treat incontinence;

c)    That the risk of adverse events with the Product was known by Defendants and were not adequately tested;

d)    That the limited clinical testing revealed the Product had a higher risk of adverse effects in addition to and above and beyond those associated with other products and procedures available to treat incontinence;

e)    That Defendants failed to follow up on the adverse results from clinical studies and buried and/or misrepresented those findings;

f)    That Defendants were aware of dangers in their Product, including the pelvic mesh systems, in addition to and above and beyond those associated with other products and procedures available to treat incontinence;

g)    That the Product was dangerous and caused adverse side effects, including, but not limited to, higher incidence of erosion and failure at a much more significant rate than other products and procedures available to treat incontinence;

h)     That patients frequently would need revisionary surgery due to changes in the structure of the Product that would cause them to be become loose or shift position within the body;

i)     That patients needed to be monitored more regularly than usual while using the Product and, in the event the Product needed to be removed, that the procedure to remove the Product had a very high failure rate and/or needed to be performed repeatedly;

j)     That material the Defendants were using carried a specific safety warning to never be used as a permanent implant in the human body;

k)     That Defendants rushed the Product to market against the concerns of consultants and employees;

l)     That Defendants were aware of safety issues with design of the Product and the pain it caused to patients and lack of effectiveness; and

m)    That Defendants were aware the Product was not as safe or efficacious as other alternatives.

79.    Defendants were under a duty to disclose to Plaintiff, her physicians, the public, and the FDA the defective nature of the Product, including, but not limited to, the heightened risks of erosion, failure, and permanent injury.

80.    Defendants misrepresented to the medical and healthcare community, Plaintiff, the FDA, and the public at large that the Product had been tested and was found to be safe and effective for the purposes of treating SUI.

81.    Defendants' concealment and omissions of material fact concerning the safety of the Product were made purposefully, willfully, wantonly, and/or recklessly to mislead, and to cause Plaintiff's physicians and healthcare providers to recommend, prescribe, dispense, and purchase the Product; and/or to mislead Plaintiff into reliance and cause Plaintiff to use the Product.

82.    Defendants had sole access to material facts concerning the defective nature of the Product and its propensity to cause serious and dangerous side effects and, hence, cause dangerous injuries and damage to women who used the Product.

83.     At the time these representations were made by Defendants and at the time Plaintiff used the Product, she was unaware of the falsehood of these representations and reasonably believed them to be true.

84.     Defendants knew or had reason to know that the Product could and would cause severe and grievous injury to the users of the Product and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

85.     The Defendants provided incomplete, insufficient, and misleading training and information to physicians in order to increase the number of physicians utilizing the Product and, thus, increase the sales of the Product, leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

86.     Defendants intentionally made material misrepresentations to the medical community, the FDA, and the public, including Plaintiff, regarding the safety of the Product, specifically that it did not have dangerous and/or serious adverse health safety concerns and that it was as safe as other means of treating SUI.

87.     Defendants intentionally failed to inform the medical community, the FDA, and the public, including Plaintiff, of the high failure rate, erosion, the difficulty of removing the Product, and the risk of permanent injury.

88.     Instead, Defendants chose to over-promote the safety, efficacy, and benefits of the Product.

89.     Defendants' intent and purpose in making these representations was to deceive and defraud the public, the medical community, and Plaintiffs; to gain the confidence of the public, the medical community, and Plaintiff; to falsely assure them of the quality and fitness for use of the

Product; and induce Plaintiff, the public, and the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Product.

90.     At the time that the representations were made, Plaintiff and her healthcare providers did not know the truth about the dangers and serious health and safety risks inherent in the use of the Product. Plaintiff did not discover the true facts about the dangers and serious health and safety risks, nor did Plaintiff discover the false representations of Defendants nor would Plaintiff, with reasonable diligence, have discovered the true facts or Defendants' misrepresentations.

91.     Plaintiff reasonably relied on revealed facts that foreseeably and purposefully suppressed and concealed facts that were critical to understanding the real dangers inherent in the use of the Product.

92.     Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Product, she would not have purchased, used, or relied on the Product.

93.     Having knowledge based upon Defendants' research and testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including, but not limited to, assuring Plaintiff, the public, and Plaintiff's healthcare providers and physicians, that the Defendants' Product was safe for use as a means of providing relief from SUI and was as safe or safer than other products or procedures available and on the market. As a result, Defendants intentionally omitted, concealed and suppressed certain results of testing and research to healthcare professionals, Plaintiff, and the public at large.

94.     Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Defendants' Product.

95.     Defendants' wrongful conduct constitutes fraud and deceit and was committed and perpetrated willfully, wantonly, and/or purposefully on Plaintiff.

96.     As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## COUNT V: DISCOVERY RULE AND TOLLING.

97.     All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

98.     Plaintiff asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

99.     Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had been injured, the cause of the  injury, and the tortious nature of the wrongdoing that caused the injury.

100.    Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages and their relationship to the Product was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's action was filed well within the applicable statutory limitations period.

101.    The running of the statute of limitations in this action is tolled due to equitable tolling. Defendants are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment through affirmative misrepresentations and omissions from Plaintiff and Plaintiff's physicians of the true risks associated with the Product. As a result of Defendants' fraudulent concealment, Plaintiff and Plaintiff's physicians were unaware, and could not have known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendants.

**COUNT VI:  GROSS NEGLIGENCE**

102.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

103.    In committing the acts and/or omissions set forth herein that directly and proximately caused Plaintiff's injuries, as set forth herein, Defendants breached their duty to Plaintiff and demonstrated a conscious, reckless, willful, and wanton indifference to and disregard of the consequences of their actions and / or omissions.

104.    Defendants have known and continue to know that some of the predicate products for their pelvic mesh products had high failure and complication rates, resulting in the recall of some of these predicate devices; that there were and are differences between the Defendants' products and some or all of the predicate products, rendering them unsuitable for designation as predicate products; that significant differences exist and existed between the Product and its predecessor and predicate products, such that the disclosures to the FDA were and are incomplete and misleading; and that the Product was and is causing numerous patients severe injuries and complications. The Defendants suppressed this information and failed to accurately and

completely disseminate or share this and other critical information with the FDA, health care providers, or the patients. As a result, the Defendants actively and intentionally misled and continue to mislead the public, including the medical community, health care providers, and patients, into believing that the Product and the procedures for its implantation were and are safe and effective. This led to the prescription for and implantation of the Product into Plaintiff.

105.    The injuries, conditions, and complications suffered by women who have been implanted with Defendants' Product include, without limitation: mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, the recurrent prolapse of organs, and, in many cases, the women have been forced to undergo intensive medical treatment including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

106.    Again, Defendants had sole access to material facts concerning the defective nature of the Product and its propensity to cause serious and dangerous side effects and, hence, cause dangerous injuries and damage to women who used the Product.

107.    Defendants were grossly negligent by showing a complete indifference for the safety and health of Plaintiff and others similarly situated in negligently designing, packaging, labeling, marketing, advertising, promoting, distributing, and selling a defective and unreasonably dangerous Product and in negligently failing to warn Plaintiff of the significant risks and complications associated with the Product, as set forth above.

108.    In light of the knowledge Defendants had concerning the risks and complications associated with its Product, as set forth above, Defendants continued to show an utter disregard and complete indifference for the safety of Plaintiff by failing to provide adequate warnings concerning the risks and complications associated with the Product, making material misrepresentations and placing profits from sales of its device over the safety of patients receiving the Product.

109.    The wrongs done by Defendants were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiff for which the law will not allow, and for which Plaintiff seeks exemplary damages, in that Defendants' conduct, including the failure to comply with applicable industry standards, was specifically intended to cause substantial injury to Plaintiff; or when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Plaintiff, and Defendants actually were subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff; or included a material representation that was false, with Defendants knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiff.

110.    As a direct and proximate result of Defendants' gross negligence, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## **COUNT VII: PUNITIVE DAMAGES**

111.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

112.    Defendants sold their Product to the healthcare providers of Plaintiff in the State of Florida and throughout the United States without doing adequate testing to ensure that the Product was reasonably safe for implantation in the female pelvic area.

113.    Defendants sold the Product to Plaintiff's health care providers and other health care providers in the State of Florida and throughout the United States in spite of their knowledge that the Product can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this Complaint, thereby causing severe and debilitating injuries suffered by Plaintiff and numerous other women.

114.    Defendants ignored reports from patients and health care providers throughout the United States and elsewhere of the Product's failure to perform as intended, which lead to the severe and debilitating injuries suffered by Plaintiff and numerous other women. Rather than doing adequate testing to determine the cause of these injuries or to rule out the Product's designs or the processes by which the Product are manufactured as the cause of these injuries, Defendants chose instead to continue to market and sell the Product as safe and effective.

115.    Defendants withheld material information from the medical community and the public in general, including Plaintiff, regarding the safety and efficacy of the Product.

116.    Defendants knew and recklessly disregarded the fact that the Product caused debilitating and potentially life altering complications with greater frequency than feasible alternative methods and/or products used to treat SUI.

117.    Defendants misstated and misrepresented data and continue to misrepresent data so as to minimize the perceived risk of injuries caused by the Product.

26

118.    Notwithstanding the foregoing, Defendants continued to aggressively market the Product to consumers, without disclosing the true risks associated with the Product until it was decommercialized in 2013.

119.    Defendants knew of the Product's defective and unreasonably dangerous nature, but continued to mislead physicians and patients and to manufacture, market, distribute, and sell the Product so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff.

120.    Defendants continue to conceal and/or fail to disclose to the public, including the Plaintiff, the serious complications associated with the use of the Product. Such was done until the Product was decommercialized in 2013 in order to ensure continued and increased sales of the Product.

121.    Defendants' conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that the Court enter judgment in her favor against Defendants for actual, compensatory, and punitive damages, plus attorneys' fees and expenses, costs, interest, and such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a jury trial on all claims so triable in this action.

Dated: October 2, 2020

Respectfully submitted,

*/s/ Brandon D. Henry*
Brandon D. Henry
Missouri Bar. No. 56289
APPEARING *PRO HAC VICE*
WAGSTAFF & CARTMELL, LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone: 816-701-1100
Facsimile: (816) 531-2372
bhenry@wcllp.com

*/s/ Jason R. Fraxedas*
Jason R. Fraxedas
Florida Bar No. 63887
Maher Law Firm, P.A.
271 West Canton Avenue, Suite 1
Winter Park, FL 32789
Phone: (407) 839-0866
Facsimile: (407) 425-7958
jrfraxedas@maherlawfirm.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this matter.

*/s/ Brandon D. Henry*
*Counsel for Plaintiff*